UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------X

United States of America,

                                    CR-05-383 (CPS)

     - against -                    SENTENCING MEMORANDUM
                                    AND OPINION

Jason Paul,

             Defendant.

------------------------------X

SIFTON, Senior Judge.

On September 13, 2005, defendant Jason Paul pled guilty to a single count of a twenty-one count indictment. That count charges that on December 22, 2004, Paul illegally transported a Smith & Wesson .40 caliber firearm into New York state in violation of 18 U.S.C. §§ 922(a)(3) and 924(a)(1). The other twenty counts remain open. The defendant is presently before the Court for sentencing. For the reasons that follow, the Court will consider a non-Guidelines sentence.

## DISCUSSION

The Supreme Court held in *United States v. Booker*, 125 S.Ct. 738 (2005), that the mandatory nature of the United States Sentencing Guidelines violated the Sixth Amendment. In its remedy opinion, the Court severed 18 U.S.C. § 3553(b)(1), which had rendered the Guidelines binding on federal sentences. *Id.* at 764. This left in effect 18 U.S.C. § 3553(a), which states:

The court shall impose a sentence sufficient, but not

greater than necessary to comply with the purposes set
forth in paragraph (2) of this subsection. The court,
in determining the particular sentence to be imposed,
shall consider--

    (1) the nature and circumstances of the offense and the
history and characteristics of the defendant;
    (2) the need for the sentence imposed--

        (A) to reflect the seriousness of the
offense, to promote respect for the law, and
to provide just punishment for the offense;
        (B) to afford adequate deterrence to criminal
conduct;
        (C) to protect the public from further crimes
of the defendant; and
        (D) to provide the defendant with needed
educational or vocational training, medical
care, or other correctional treatment in the
most effective manner;

    (3) the kinds of sentences available;
    (4) the kinds of sentence and the sentencing range
established for--

        (A) the applicable category of offense
committed by the applicable category of
defendant as set forth in the guidelines...;

    (5) any pertinent policy statement--

        (A) issued by the Sentencing Commission
pursuant to section 994(a)(2) of title 28,
United States Code, subject to any amendments
made to such policy statements by act of
Congress....

    (6) the need to avoid unwarranted sentencing
disparities among defendants with similar records
who have been found guilty of similar conduct; and
    (7) the need to provide restitution to any victims
of the offense.

In sentencing a defendant, the Court must determine the

applicable Sentencing Guidelines range after making such factual

findings as are necessary. *United States v. Crosby*, 397 F.3d 103,

112 (2d Cir. 2005). The applicable Guideline range is determined

in the same manner as before *Booker*. *Id*. The Court has the duty

to "consider" this Guidelines calculation along with the other

relevant factors listed in § 3553(a). *Id.* at 112-13. The applicable factors are discussed below.

<u>Characteristics of the Defendant</u>

These facts are drawn from the Presentencing Investigation Report (PSI). They are undisputed except as noted.

Defendant Jason Paul was born on January 8, 1982 in Port of Spain, Trinidad to Lennard and Joanne Paul. He is currently 24 years of age. Paul lived in Trinidad with his grandmother, Francesca Paul, until he was 18 years old. He presently lives in Brooklyn with his sisters and parents as a United States Permanent Resident. The defendant has had a relationship with his girlfriend, Alycha Philipps, age 22, since 2003. In February 2006, the couple gave birth to their first child. Paul gives half of his paycheck to Philipps to help with her expenses.

After Paul arrived in the United States, he enrolled at LaGuardia Community College where he majored in telecommunications and earned a 3.8 grade point average. He subsequently transferred to St. John's College where he studied telecommunications and fiber optic engineering, earning a 3.68 grade point average. Since 2003, defendant has been employed as a technology installation manager with Circuit City in Brooklyn, earning a salary of $14.50 per hour plus commissions. Defendant's financial records reveal that is unable to pay any fine imposed by this Court.

The Offense

The conviction in this case arose out of an investigation conducted by Special Agents of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). The investigation commenced after a Smith & Wesson .40 caliber pistol was recovered near the Canarsie Pier in Brooklyn, New York on January 11, 2005 by a fisherman. Although the serial number on the gun had been filed down, the number was recovered in a laboratory, and ATF Agents were able to determine that the gun was purchased by the defendant on December 22, 2004 at Southeast Archer & Sports in Folcroft, Pennsylvania. The ATF Agents also determined that the gun had been used in a homicide on January 8, 2005, three days prior to its recovery.

ATF Agents interviewed Southeast Archery & Sports staff members present during the sale of the gun. They reported that defendant entered the store with three other individuals. In connection with the purchase, defendant listed his address as 7701 Lindbergh Boulevard, Philadelphia, Pennsylvania 19153, and provided a Pennsylvania driver's license bearing the same address. He also listed his employer as "Altitunes," a music retailer located at the Philadelphia International Airport. Agents interviewed the apartment complex manager at 7701 Lindbergh Boulevard, who stated that defendant had never resided at the complex; the apartment in question had been vacant for six

months and before that, occupied by a single female for approximately two years. Agents also interviewed a regional manager at Altitunes, who informed them that defendant was not, and had never been, an employee.

Agents also conducted a database search which revealed that defendant purchased seventeen firearms at different licensed firearms dealers in Pennsylvania over a period of less than four months. Interviews conducted with those dealers revealed that for each purchase, the defendant appeared with three other individuals and provided the same Pennsylvania address and employer on the purchase forms as those provided in connection with the Smith & Wesson purchase.

On February 25, 2005, ATF Agents interviewed defendant with his attorney present. He admitted that he did not reside in Pennsylvania but stated that on his days off from work, he went to Pennsylvania to register at the University of Pennsylvania. He stated that while there, he stayed with a friend of the family at the Lindbergh Boulevard address. He stated that he purchased "approximately" fifteen firearms between September 2004 and January 2005. He also admitted that he traveled to Pennsylvania with three individuals, two of whom could not legally purchase firearms in Pennsylvania because they did not have Pennsylvania identification, and the third could not purchase firearms because he was on probation and had several prior criminal convictions.

Defendant Paul also stated that three of the firearms in question were purchased for other people, including the individual on probation, and the rest were for the defendant's personal collection. The defendant also stated that when one of his sisters found the guns in their common residence, she became angry and insisted that he dispose of them. On January 6, 2005, defendant Paul said he threw approximately eleven of the firearms into the East River from the Brooklyn Bridge. Unbeknownst to his sister, he retained three of the firearms: a .25 caliber handgun, a .45 caliber pistol, and the .40 caliber pistol that was used in the January 8, 2005 homicide.

Paul was arrested on May 4, 2005, when he surrendered to ATF Agents at their Brooklyn field office. Prior to his arrest, two of the guns defendant admitted keeping were recovered in connection with other offenses: the Smith & Wesson .40 caliber used in the homicide was discovered by a fisherman as noted above, and the .45 caliber pistol was recovered from one of the individuals who traveled to Pennsylvania with defendant. That individual was arrested on weapons possessions charges.

Two of the firearms defendant claimed to have thrown into the East River were later recovered in connection with other offenses: On May 3, 2005, a Bersa Thunder .380 caliber pistol was recovered from four individuals during a car stop, and on July

11, 2005, another Bersa Thunder .380 caliber pistol was recovered during a separate car stop.[1]

## Guidelines Calculations

Pursuant to § 2K2.1(a)(7) of the Sentencing Guidelines, Paul's base offense level for firearm trafficking is twelve. After adding four levels, pursuant to § 2K2.1(b)(1)(B), to reflect the quantity of guns involved and two levels, pursuant to § 2K2.1(b)(4), to account for the obliterated serial numbers, the offense level is eighteen. A three level reduction for acceptance of responsibility pursuant to § 3E1.1 is appropriate, bringing the total offense level to fifteen. Paul's criminal history category is I. The Sentencing Commission's recommended sentence is eighteen to twenty-four months. The maximum statutorily authorized term of imprisonment is five years. 18 U.S.C. § 924(a)(1). Paul does not object to these calculations.[2]

## The Seriousness of the Offense and General Deterrence

Section 3553(a)(2) instructs the Court in sentencing defendants to consider the seriousness of their conduct and the

---

[1] The government states that the fact that defendant lied about the guns to ATF agents at his interview should be viewed as an aggravating factor when sentencing defendant. Defendant argues that the facts outlined above do not necessarily mean that defendant lied to ATF agents, since defendant told the agents that he discarded "approximately eleven" firearms.

[2] A range of 30-37 months is set forth in the plea agreement. The guidelines calculations in the plea agreement contain a 4-level enhancement for "Transfer with Reason to Believe that Firearm Would be Used Feloniously" pursuant to § 2K2.1(b)(5), bringing the sentencing range to 30-37 months imprisonment. Because the PSI does not include this enhancement, and because the parties do not dispute the calculation or any factual basis for it, I use the guidelines calculations as they set forth out in the PSI.

need to deter the public at large from following in their
footsteps. One factor that bears on the seriousness of the
offense and the need for deterrence is the likely harm that could
result from the commission of the crime in question. The likely
harm from an offense or class of offenses is in part a product of
factors external to the criminal activity itself -- in other
words, factors determined by the environment in which the crime
is committed.[3] In the pursuit of national uniformity in
sentencing practices, however, the Guidelines generally do not
take into account how local circumstances regarding the
seriousness of various offenses and how the need for protection
of the public and deterrence may vary across districts.

In a prior decision, I concluded that in fashioning
appropriate sentences in gun cases, judges may take into account
the impact of the type of crime committed by the defendant in the
particular community in which it was committed. *United States v.
Lucania*, 379 F.Supp.2d 288 (E.D.N.Y.2005). I noted that the
Sentencing Guidelines "represent a national 'average' that does
not reflect objective variations in the increased risk of death
or injury that the offense creates in different parts of the
country." *Id*. at 296. Although the Courts of Appeals interpreting
the Guidelines have declined to permit departures from the

---

[3] For example, the sale of narcotics within 1000 feet of a school. *See*
21 U.S.C. § 860.

Guidelines based on "community standards" or "local public
opinion," *see, e.g. United States v. Barbontin*, 907 F.2d 1494,
1498 (5th Cir. 1990); *United States v. Aguilar-Pena,* 887 F.2d
347, 351-53 (1st Cir. 1989); *United States v. Hadaway*, 998 F.2d
917 (11th Cir. 1993), I determined that an objective
determination of the seriousness of the offense pursuant to 18
U.S.C. § 3553(a)(2), such as whether "the crime will have a
greater or lesser impact given the locality of its commission is
appropriately considered in crafting a reasonable sentence post-
Booker." *Lucania*, 379 F.Supp.2d at 296.

> Consistent with this analysis, Judge Raggi has argued
> that the Sentencing Guidelines...did not adequately
> reflect the seriousness of the impact that illegal
> firearm trafficking has on large metropolitan areas such
> as exist within the Eastern District of New York. 5 FED.
> R. SENT. REP. 306. Firearms smuggled into New York City
> commonly end up in the hands of those who could not
> otherwise legally acquire them, are frequently used for
> illegitimate purposes, and have the potential to create
> a substantially greater degree of harm when in an urban
> environment such as New York City than in the United
> States generally.

> *Id*. at 294-295.

The impact of guns and gun trafficking in New York City is
well-documented. As recently as April 28, 2006, the New York
Times reported that between 2003-2005, 1662 murders were reported
in New York City, and of those, 66% were committed using
firearms. Jo Craven McGinty, *New York Killers, and Those Killed,
by Numbers*, N.Y. TIMES, April 28, 2006, A1. Forty percent of the
total number of murders were committed in Brooklyn within the

Eastern District of New York. *Id*. Studies conducted by the Bureau
of Alcohol, Tobacco, Firearms and Explosives (ATF) reveal that
over three quarters of the guns used in crimes in New York
originated in other states. Bureau of Alcohol, Tobacco, Firearms
and Explosives, ATF Youth Crime Gun Trace Report 1999 for New
York and Other Cities, (Nov. 30, 2000) (available at http://www.
atf.treas.gov/field/newyork/press/113000nycityycgii.htm)
(stating, "80% of traceable crime guns recovered in NY City came
from sources outside NY State"); DAVID HEMENWAY, PRIVATE GUNS,
PUBLIC HEALTH 149 (2004) (citing Bureau of Alcohol, Tobacco and
Firearms data showing that, in Florida, 70 percent of guns used
in adolescent crime and 77 percent of guns used in young adult
crime originally came from Florida, whereas in New York City only
6 percent of guns used in adolescent crime and 10 percent of guns
used in young adult crime originated in New York state).

New York state and city legislators have responded to the
problem. In the year 2000, in an effort to stem the illegal
transportation of firearms into the state, New York state adopted
a gun trafficking interdiction program. N.Y. EXEC. LAW § 230
(McKinney 2001). The program authorizes New York district
attorneys to enter into collaborative agreements with law
enforcement agencies in "supplier" states to prosecute gun
traffickers who bring guns into New York State and requires that
state and local law enforcement coordinate with the ATF to trace

the origin of guns used in crimes in New York. *Id*. In December
2005, Governor George E. Pataki announced that $4.5 million in
new funding and 100 new State Police Investigators would be
dedicated to stemming the flow of illegal firearms into the
state. Bureau of Alcohol, Tobacco, Firearms and Explosives, New
York Field Division, N.Y. Governor Deploys 100 New State Police
Investigators To Gun Trafficking Task Forces Throughout State,
(Dec. 22, 2005) (available at http://www.atf.gov/press/
fy06press/field/122205ny_guntrftaskforce.htm). Moreover, in
recognition of the impact of illegal firearms trafficking on
urban cities, New York City Mayor Michael R. Bloomberg recently
organized a mayors' meeting on the issue of gun trafficking on
April 25, 2006. Sewell Chan, *Seeking a National Voice, 15 Mayors
Meet on Gun Violence*, N.Y. TIMES, April 26, 2006, at B1. Clearly,
gun trafficking poses a greater threat in New York City and
similarly situated large metropolitan areas than it does in other
parts of the country.

In *Lucania*, I further stated that "[s]tiffer sentences for
gun traffickers who move their wares into large metropolitan
areas such as New York City are also supported by the purpose of
gun trafficking laws, which is to prevent lax firearm laws in one
state from undermining the more restrictive laws of other
states." *Lucania*, 379 F.Supp.2d at 295. The sentence range for
Paul's offense under New York state law illustrates this point.

Whereas the Federal Sentencing Guidelines recommend an

imprisonment range in this case of eighteen to twenty-four

months, a conviction for transporting or shipping firearms in

violation of New York Penal Law § 265.10 is a class D felony,

subjecting a defendant to a sentence of two to seven years

imprisonment. *See* N.Y. PENAL LAW § 70.02(3)(c).

> That New York, a state containing the largest urban
> community in the country, treats this sort of offense
> more seriously than the United States Sentencing
> Guidelines, which were designed to produce uniform
> sentences without respect to geography or local community
> concerns, is not surprising. The United States at large
> is substantially more rural than New York. Firearms are
> less likely to cause harm in more rural areas, if only
> because they are less likely to cause harm to innocent
> bystanders. They also have more legitimate recreational
> uses in rural states than in New York. New York courts
> accordingly consider stemming the flow of weapons into
> New York a "critical law-enforcement goal." *People v.
> Brown*, 99 N.Y.2d 488, 493 (N.Y. 2003).

*Lucania*, 379 F.Supp.2d at 296 -297.[4]

It is widely recognized that New York state gun laws are

more strict than those of other states. National Rifle

Association Institute for Legislative Action, *Guide to the*

---

[4] I do not point out the difference between the sentencing range
provided for under New York law and that set forth in the Sentencing
Guidelines in support of the argument that disparities between federal and
state sentencing should be considered under 18 U.S.C. § 3553(a)(6), which has
been expressly prohibited by several pre- and post-*Booker* courts. *See, e.g.,
United States v. Clark*, 434 F.3d 684, 687 (4th Cir.2006); *United States v.
Cropper*, 2006 WL 372338, *5 n.7 (3d Cir.2006); *United States v. Snyder*, 136
F.3d 65, 68-70 (1st Cir.1998); *United States v. Searcy*, 132 F.3d 1421, 1422
(11th Cir.1998); *United States v. Deitz*, 991 F.2d 443, 447-48 (8th Cir.1993);
*United States v. Haynes*, 985 F.2d 65, 69-70 (2d Cir.1993); *United States v.
Sitton*, 968 F.2d 947, 962 (9th Cir.1992); *United States v. Dockery*, 965 F.2d
1112, 1117-18 (D.C.Cir.1992). Rather, I view the difference as evidence that
gun trafficking is a more dangerous crime in New York than it is in the rest
of the nation on average.

*Interstate Transportation of Firearms*, available at

http://www.nraila.org/GunLaws/FederalGunLaws.aspx?ID=59 (stating,

"New York is the only state that prohibits the transportation of

handguns without a license," and calling New York state's gun

control statutes "highly restrictive"); Brendan J. Healey,

Plugging the Bullet Holes in U.S. Gun Law: An Ammunition-Based

Proposal For Tightening Gun Control, 32 J. Marshall L. Rev. 1, 12

(1998) (stating that "Massachusetts and New York...boast[] two of

the strictest gun control laws at the state level").

Here, as in *Lucania*, the defendant has illegally transported

firearms into New York state. Some of those firearms have been

used in connection with other offenses, most notably, a homicide.

Thus, the factors enumerated in 18 U.S.C. § 3553(a)(2), all else

being equal, support a non-guideline sentence in this case.

<u>Unwarranted Sentencing Disparity</u>

Section 3553(a) instructs the Court to consider "the need to

avoid unwarranted sentencing disparities among defendants with

similar records who have been found guilty of similar conduct."

As I noted in *Lucania*, although it may be argued that granting a

non-Guidelines sentence based on the varying impact a crime has

in different locations may increase disparity between districts,

disparity which is the result of factual differences between the

seriousness of the two offenses is not "unwarranted." Where two

similarly situated defendants are sentenced differently in two

different districts based on objectively demonstrated, material differences between the seriousness of the offenses in those districts, such disparity is not "unwarranted." Accordingly, I conclude that a departure in this case is consistent with 18 U.S.C. § 3553(a)(6).

<u>Specific Deterrence</u>

Section 3553(a)(2)(C) also requires the Court to specifically consider the need for specific deterrence, that is to deter this particular defendant from committing similar offenses in the future. Given the particular dangers of gun trafficking in the New York metropolitan area as described above, the need for deterrence is heightened. Accordingly, I conclude that this factor as well would support a non-guideline sentence.

**CONCLUSION**

For the foregoing reasons, I will at sentencing consider a non-Guidelines sentence.

The Clerk is directed to transmit a copy of the within to all parties.


SO ORDERED.

Dated :    Brooklyn, New York
           May 8, 2006


By: <u>/s/ Charles P. Sifton (electronically signed)</u>
           United States District Judge